Carlyle **MICHELMAN**, Trustee of Textura, Ltd. in Bankruptcy Proceedings, Plaintiff-Appellee,

v.

**CLARK–SCHWEBEL FIBER GLASS CORPORATION,**

and

**Burlington Industries, Inc., Defendants-Appellants.**

Nos. 588, 663–665, Dockets 75–7332, 75–7593, 75–7594 and 75–7598.

United States Court of Appeals, Second Circuit.

Argued Jan. 15, 1976.

Decided April 21, 1976.

Haliburton Fales, 2d, New York City (Thomas McGanney, J. Michael Brown, White & Case, New York City, of counsel), for defendant-appellant Clark-Schwebel Fiber Glass Corp.

Donald L. Hardison, Washington, D. C. (Robert W. Devos, Jr., Bergson, Borkland, Margolis & Adler, Washington, D. C., of

counsel), for defendant-appellant Burlington Industries, Inc.

Howard Breindel, New York City (Wells Burgess, Robert Aronson, Regan, Goldfarb, Heller, Wetzler & Quinn, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, SMITH and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Unraveling the complexities of an antitrust case usually places a heavy burden on all concerned, and perhaps the greatest on the finder of the facts. After a four-week trial before Charles H. Tenney, *Judge,* of this private antitrust suit for $9,750,000 treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, by the trustee in bankruptcy of Textura, Ltd. ("Textura"), the jury returned a verdict of $531,617 damages (before trebling) in the plaintiff's favor upon the claim that defendants-appellants, Clark-Schwebel Fiber Glass Corporation ("Clark-Schwebel") and Burlington Industries, Inc. ("Burlington") had violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to cut off supplies and credit to Textura, thus forcing it out of business. Although the verdict was the product of four days of jury deliberation we are satisfied that, even when the evidence is viewed most favorably to the plaintiff, the verdict cannot be upheld. Accordingly, we must conclude that the defendants' motions for a directed verdict and judgment notwithstanding the verdict should have been granted.

The action was begun on December 9, 1966, in the Southern District of New York by Textura, Ltd. (for which its trustee in bankruptcy, Carlyle Michelman, was later substituted), its wholly-owned subsidiary Fenesta Fabrics, Inc. and Malcolm G. Powrie, majority shareholder and principal officer of Textura, against Clark-Schwebel, Burlington and J. P. Stevens & Co., Inc. ("Stevens"). Textura, a converter of decorative fiber glass fabrics into draperies, alleged that the defendants, who were suppliers of such fabrics, had conspired in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, to restrain trade in the sale of such fabrics by using various means to drive Textura out of business, including the restriction of credit on sales to it, the withholding or delaying of deliveries to it, the shipment of defective merchandise to it and the inducement of its factor, L. F. Dommerich & Co. (which was named as a co-conspirator) to terminate financing of its receivables. In addition to this claim, the trial of which forms the basis of the present appeal, Textura also claimed that in refusing to extend credit to it the defendants had discriminated against it in violation of the Robinson-Patman Act, 15 U.S.C. §§ 13(a) and (e), that the defendants had unlawfully fixed prices of decorative and industrial fiber glass fabrics and that they had monopolized and attempted to monopolize trade and commerce in fiber glass industrial fabrics in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

Trial of the action was begun on October 15, 1974, before Judge Tenney and a jury. At the close of the plaintiff's case the court directed a verdict for the defendants on the decorative fabrics price-fixing claim and the plaintiff voluntarily dropped the Robinson-Patman Act and monopolization claims. Answering written questions, the jury found that there was a conspiracy between Clark-Schwebel and Burlington to drive Textura out of business but rendered a verdict on that claim in favor of Stevens, which it found not to be a member. It awarded $531,617 single damages to Textura against Clark-Schwebel and Burlington. In addition it rendered a total verdict of $99.56 single damages in favor of Textura against Burlington and Stevens on the industrial fiber glass fabric price-fixing claim. The claims of Powrie and Fenesta Fabrics Inc. were dismissed.

The district court denied defendants' motions made during trial for a directed verdict and their post-verdict motions for judgment notwithstanding the verdict, which were based upon the contention that the evidence was insufficient to support an inference of conspiracy to drive Textura out of business. Upon this appeal the two appellants advance this same contention as

the principal ground for reversal. They also seek reversal on the ground that Textura failed to prove that it suffered any damages as a result of the alleged conspiracy or that any such damages were caused by the defendants. In the alternative they seek a new trial because of errors claimed to have been committed in the conduct of the trial.

## THE FACTS

A short outline of the undisputed facts with respect to the history of Textura and its dealings with the defendants is essential to our review and analysis of the record. Though Textura's predecessor was formed in 1954,[1] the company operated on only a small scale until 1958, when Malcolm G. Powrie, Textura's president, decided to step up the company's operations. Textura's primary business consisted of purchasing bulk fiber glass fabrics from three suppliers —Clark-Schwebel, Burlington and Stevens—and converting the fabrics into finished draperies, which were then sold for use as window drapes.

Textura's method of operation represented an innovation in this area. Previously, owners of large office buildings had purchased only venetian blinds as window coverings; those tenants who desired drapes had to buy the drapes themselves on a piecemeal basis. Textura pioneered the bulk sale of fiber glass drapes directly to building owners for use in an entire building, thereby eliminating the need for venetian blinds. Generally, Textura attempted to obtain a specification for use of one of its exclusive fabric styles from the owner of a new building as it was being planned. If successful, Textura would then install the drapes at a later point, sometimes more than two years thereafter, when construction of the building had been completed.

Textura faced obstacles in developing this new method of selling fiber glass drapes. One difficulty arose from the fact that engineering data concerning the effect of venetian blinds on a building's heating and air conditioning requirements were well developed, while similar data concerning fiber glass drapes did not exist. Building owners were thus reluctant to buy drapes rather than venetian blinds because of the difficulty in computing how much heating and air conditioning they might then require. To cope with this problem, Textura engaged heating engineers to develop the relevant data for fiber glass drapes. This research, for which Textura received financial aid from Clark-Schwebel and others, took several years and culminated in the publication of a booklet in early 1965 to be used as a marketing tool in convincing reluctant building owners to buy drapes rather than venetian blinds.

Another difficulty arose from the long delay between Textura's making of a contract to install drapes in a building and the actual installation and receipt of payment by it. To avoid the necessity of financing large amounts of inventory during this period, Textura asked for and received special arrangements from each of the three companies, Burlington, Clark-Schwebel and Stevens, which supplied the bulk fiber glass fabrics used in its draperies.[2] While none of these arrangements was ever reduced to writing, Textura was informally allowed to place bulk orders for fabrics with the supplier, which would then weave the fabrics, and hold them in its inventory until Textura called for them. The fabrics were generally held by the supplier for some months, and in some instances, for a year or more before Textura called for delivery and was billed for them by the supplier. Since Textura paid no interest for this investment in

---

1. The predecessor, known as Glass Fabrics, Inc., transferred its assets to Textura in 1965. For convenience, we shall refer to both companies as Textura.

2. Plaintiff suggests that the existence of these "identical credit arrangements" which Textura had long enjoyed with its three major suppliers indicates that those companies were following

a "common credit policy" toward Textura even before the period of the alleged conspiracy. Aside from the fact that the arrangements were only similar, not identical, the record clearly shows that the similarity arose from Powrie's request for such arrangements from each of Textura's suppliers.

inventory, it thus gained a benefit not enjoyed by other customers. Furthermore, while the terms of the supplier's invoice required payment within 30 or 60 days, Textura rarely, if ever, met these terms; often it did not pay until 90 days or more after the invoice date, and on one occasion 140 days later. For the most part, Textura was apparently not charged interest on these overdue bills.

Over the years each supplier periodically would press Textura to "call out" fabrics sooner, and to speed up its payments for fabrics already delivered. However, their methods of trying to obtain prompter payment varied. In 1963, for instance, which was long prior to the alleged conspiracy, Raymond P. Nordheim, Vice President of Clark-Schwebel, wrote Powrie in June, October, and December, asking him to send payments on Textura's account. Burlington, on the other hand, asked Powrie and other stockholders of Textura on various occasions (1957, 1958, 1962 and 1964) to guarantee personally payment of the firm's debts. However, Powrie refused to give such a guarantee.

Until 1964, Textura had operated primarily in California, and had achieved some success in that market; the company showed net profits of $40,091 in 1962, and $49,285 in 1963. However, in 1964, when Textura expanded its sales operations and staff throughout the nation, the expenses involved in this expansion took their toll on the company which, according to the testimony of Powrie, its President, was always a thinly financed company. Textura experienced net losses of $113,788 in 1964 (characterized as "staggering" by Powrie), and $31,195 in 1965 (which made Textura's financial statement look "horrible" according

to Powrie). It reported a negative working capital in both years,[3] indicating an extremely shaky financial condition.

Textura's financial reverses created increasing concern among its suppliers about payment of Textura's outstanding bills. Each supplier, however, adopted an independent approach to the problem. In early 1965, Burlington succeeded in obtaining from Powrie a personal guarantee, effective until the end of 1965, and an agreement to try to keep Textura's account within 90-day limits and to work toward even prompter payment than that.

Stevens and Clark-Schwebel adopted different measures. In April, 1965, Stevens put a flat $10,000 limit on the credit it would advance to Textura, and demanded that the latter pay bills outstanding in excess of that amount. Clark-Schwebel, during the early part of the year, prodded Textura, sometimes with humor, to speed up its payments,[4] but as 1965 drew to a close, its attitude toughened. Clark-Schwebel began charging Textura interest on accounts more than 30 days old, and finally, on December 27, took the drastic step of holding up further shipments of fabric to Textura "until this matter is straightened out." Textura also pressed complaints of its own against Clark-Schwebel during the year; it repeatedly notified Clark-Schwebel that it had received defective fabrics, and unsuccessfully asked the latter to make appropriate adjustments.[5]

It is against this undisputed background that we turn to 1966, the year of the alleged conspiracy. The principal events relied upon by Textura begin on March 1, 1966. During the first two months of 1966, Textura had made some payments on its account with Clark-Schwebel, and the latter

---

3. The working capital deficit amounted to $98,650 as of December 31, 1964, and to $50,906 as of December 31, 1965.

4. On February 25, 1965, Nordheim of Clark-Schwebel wrote Powrie of Textura outlining the past due bills of Textura. "We would appreciate it enormously if you would take the time to look into the 'exchequer' and send us some of your loot," Nordheim's letter stated. (Def. Ex. T)

5. While Textura had difficulties with the quality of the fabrics received from all three suppliers, Powrie testified that his difficulties with Clark-Schwebel were the greatest, because that company, unlike Burlington and Stevens, did not make satisfactory adjustments when Textura raised claims about the quality of fabrics delivered.

company made some fabric shipments to Textura. The dispute over the quality of fabrics shipped by Clark-Schwebel remained unresolved, however, and on February 27, Textura brought the matter to a head by notifying Clark-Schwebel that it was taking a $30,000 credit on its bills as an offset for damages claimed to have been sustained because of the defective fabrics. This action was contrary to the terms of the contract between the parties, which required arbitration of such disputes. On March 1, Clark-Schwebel retaliated by (1) billing Textura approximately $92,000 for all the fabrics manufactured pursuant to Textura's orders and held in inventory but not yet called out by Textura, (2) refusing to extend credit, and (3) demanding immediate payment of all the outstanding invoices.

Attempts to reach an informal settlement of the dispute were fruitless, and on June 9, Clark-Schwebel initiated a formal arbitration proceeding. There is no evidence that Burlington was involved in Clark-Schwebel's decisions to bill Textura for the fabrics and to take the dispute to arbitration. In fact Burlington did not even learn of Clark-Schwebel's termination of credit to Textura and the possible arbitration of the dispute until June 8, 1966.

The exchange of salvos on February 27 and March 1 virtually ended normal commercial relations between Textura and Clark-Schwebel. While Clark-Schwebel made some shipments of fabric to Textura later in 1966, it did so only for immediate cash payment, and the total shipments amounted to only a small percentage of the previous year's shipments. On July 29 the two companies agreed to settle their dispute, Textura undertaking to accept delivery of and pay cash for $70,000 of the warehoused goods during the next three months, after which it would receive a $12,000 credit as an adjustment of its quality claims. Powrie testified that he told Clark-Schwebel that the terms of the agreement were impossible, and he accepted them only because he had no choice. However, the agreement was later modified at Textura's

request and still that company failed to perform it, making only one $5,000 payment during the rest of the year.

Turning to Textura's relations with Burlington in 1966, the personal guarantee which Powrie had executed for Burlington expired on December 31, 1965. On January 5, 1966, Burlington requested a renewal for the year 1966 but Powrie resisted or stalled and the request was unsuccessfully renewed several times during the early part of the year. Despite the refusal to sign the guarantee, however, Burlington, unlike Clark-Schwebel, continued to ship goods on credit to Textura in large quantities through July. Although Burlington held up credit approval of some new orders placed by Textura in March and April, which resulted in certain fabrics (e. g., "Crown") becoming temporarily unavailable to Textura in August and September, it later accepted these orders and another order placed in May to replace some of the fabrics Clark-Schwebel had refused to weave for Textura. Burlington actually wove a large amount of one fabric, "Homespun," previously made for Textura by Clark-Schwebel prior to the breakdown in their relations.

As Powrie later conceded, the news that Clark-Schwebel was putting into arbitration a claim of approximately $90,000 against Textura would, in view of its poor financial condition, naturally tend to make others wary about extending credit to Textura, since a decision in favor of Clark-Schwebel could put Textura in bankruptcy. After the arbitration was filed Burlington renewed its request to Powrie for a personal guarantee of Textura's debts. Stevens also requested a guarantee. However, no such guarantee was given. Although Burlington's shipments to Textura plunged during August and September because of Burlington's delay in approving the new orders placed in March and April, shipments from Burlington rose in October and November as a result of Burlington's later decision to accept the new orders and to continue shipping goods to Textura without a personal guarantee. In return Textura agreed to work to keep its account within 60-day

terms. During the period following Clark-Schwebel's filing of the arbitration proceeding, officials of Clark-Schwebel and Burlington discussed in a series of telephone conversations the progress of the Textura-Clark-Schwebel settlement negotiations and other factors relating to Textura's financial stability.

One other blow received by Textura during 1966 deserves mention. Textura depended on its factor, L. F. Dommerich, Inc. to bolster its cash flow by purchasing its accounts receivable. Sometime during the summer of 1966 Dommerich decided to terminate its factoring agreement, and in preparation for that step, built up large cash reserves of approximately $84,000 against Textura's account in July and August of that year, thereby depriving Textura of badly needed cash. Dommerich's notice of termination was sent on August 10, to be effective October 10. The reasons for Dommerich's decision to terminate Textura do not appear on the record, but there is no evidence that the appellants were involved in that decision.[6]

The termination of the factoring agreement appears to have sealed Textura's fate. Though Dommerich relented to the extent of continuing its factoring operations for Textura into December, Textura's efforts to find another factor did not succeed, and on December 15, 1966, Textura filed an assignment for the benefit of creditors.

Further facts relating to the conspiracy claim will be discussed below in our consideration of the parties' contentions.

## THE LAW

■ In considering appellants' contention that the evidence was insufficient to support plaintiff's conspiracy claim, the scope of our review power is narrow. We are "bound to view the evidence in the light most favorable to [the plaintiff] and to give [him] the benefit of all inferences which the

evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777, 782 (1962). To do otherwise would displace the jury from its proper role as the finder of fact and deny plaintiff his right to trial by jury. If, however, after viewing all the evidence most favorably to plaintiff, we cannot say that the jury could reasonably have returned the verdict in his favor, our duty is to reverse the judgment below. The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial.

■ The central issue in this case is whether the proof fairly supports the finding of an unlawful agreement between Burlington and Clark-Schwebel. If it shows at best merely that the two firms acted independently, each exercising its own business judgment in its dealings with Textura, then the verdict cannot stand. The Sherman Act's prohibition of "every contract, combination, or conspiracy" in restraint of trade does not forbid a supplier from independently deciding to refuse to do business with another, no matter how harmful that decision may be to the latter. Section 1 "does not prohibit independent business actions and decisions. A person still has the right to refuse to do business with another, provided he acts independently, and not pursuant to an unlawful understanding, tacit or expressed." *Modern Home Institute Inc. v. Hartford Accident and Indemnity Co.*, 513 F.2d 102, 108 (2d Cir. 1975). If, on the other hand, there was evidence, viewed most favorably to the plaintiff, which would indicate an agreement existed between the appellants to cut off Textura from goods and credit, this agreement could not be defended as a reasonable restraint of trade under the doctrine of *Standard Oil*

---

**6.** During the trial Judge Tenney observed that there had been no proof that Dommerich had participated in the alleged conspiracy. Interpreting this as a ruling, the defendants refrained from offering evidence to the effect that

Dommerich had terminated its agreement with Textura because of what it considered to be fraud on Textura's part in attempting to obtain advances on undue invoices.

*Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Because of its inherently anti-competitive nature, a group boycott of the type alleged here is unreasonable *per se*, and thus always illegal. See, e. g., *Klor's Inc. v. Broadway-Hale Stores Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

■ Since conspiracies, whether among businessmen or others, are rarely evidenced by explicit agreements, the determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators. At a minimum, their actions, to support a finding of a conspiracy, must suggest a commitment to a common end. "[T]he circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575, 1594 (1946).

■ Applying these principles here the evidence, viewed most favorably to the plaintiff, fails to provide any reasonable ground for a finding of any agreement or plan, tacit or otherwise, to restrain Textura's trade or to achieve any of the unlawful objectives claimed by the plaintiff, such as to cut off supplies or credit to Textura, to drive it out of business, to ship it defective goods, or to put pressure on it to accede to Clark-Schwebel's demands. The record, on the contrary, reveals at most independent efforts by each of three suppliers lawfully to continue doing business with a customer which was in a financially precarious condition on terms that would protect the supplier from ending up unable to obtain payment for goods supplied. Each pursued a substantially dissimilar and divergent course from the others in its effort to achieve this objective; each was, however, ultimately unsuccessful in obtaining payment of all of Textura's indebtedness to it.

The dissimilarity between the conduct of the two defendants in their dealings with Textura extended to such basic matters as their willingness to ship goods on credit to Textura, the credit policy terms of each toward Textura, and the adjustment of quality claims. The evidence with respect to these matters not only fails to provide any basis for a finding of conspiracy, it reveals conduct that is diametrically opposed to and inconsistent with any such combination or agreement. For example, when Clark-Schwebel refused to accept orders to ship goods on credit to Textura, Burlington not only shipped goods in record amounts to Textura on credit but even accepted and filled orders for some of the very goods cut off by Clark-Schwebel. To be sure, Burlington did take some steps to assure that its advances of credit to Textura would be repaid, but all the evidence indicates that those steps were solely the result of Burlington's own assessment of Textura's financial position, and not the product of a conspiracy with Clark-Schwebel. Given this failure to show evidence probative of a conspiracy, the verdict cannot stand.

*The Shipment of Goods by Clark-Schwebel and Burlington to Textura*

The radical difference between Clark-Schwebel's and Burlington's treatment of Textura during the alleged conspiracy is illustrated, first of all, by the pattern of their 1966 shipments to that company. In 1965, before the conspiracy is alleged to have begun, Clark-Schwebel shipped an average of $11,200 per month of fabrics to Textura.[7] During the first seven months of 1966 (the period when Textura unilaterally asserted a $30,000 credit on its bill owed to Clark-Schwebel, prompting the latter to re-

---

7. The total 1965 shipments amounted to $134,506. (Pl. Ex. 884).

taliate by putting Textura on a cash basis and billing it for warehoused goods, which led to the arbitration proceeding that was settled on July 29) the monthly dollar value of Clark-Schwebel's shipments was as follows:

| | |
|---|---|
| January | $8,809.72 |
| February | 5,092.05 |
| March | None |
| April | None |
| May | 5,596.18 |
| June | 8,132.20 |
| July | 478.95 |

All shipments after March 1 were COD (Def. Ex. CK).

Thus Clark-Schwebel drastically cut its sales to Textura as a result of its dispute with that company, shipping no fabric at all in two months (March and April) and an insignificant amount in one month (July). Two other months (February and May) saw shipments of about 50% of the 1965 months average, and only in the remaining two months did the shipments reach roughly 80% of that average.

Had Burlington and Clark-Schwebel been conspiring to coerce Textura into accepting Clark-Schwebel's demands, one would expect Burlington's shipments to be reduced similarly, thereby increasing the pressure on Textura to settle its dispute with Clark-Schwebel on terms unfavorable to Textura. However, on the contrary, Burlington's shipments to Textura increased substantially during this period over comparable 1965 figures. The average monthly yardage shipped to Textura by Burlington in 1965 was 14,100 yards of fabric.[8] The shipments (in yards) for the first seven months of 1966 were as follows:

| | |
|---|---|
| January | 15,672 |
| February | 15,759 |
| March | 17,110 |
| April | 45,585 |
| May | 14,833 |
| June | 12,670 |
| July | 11,686 |

(Pl. Ex. 829)

Thus, during the key period when Clark-Schwebel and Textura were engaged in their dispute, finally settled on July 29, Burlington's shipments were, in five of seven months, higher than the 1965 average monthly shipment, and in the month of April, the month after the dispute between Textura and Clark-Schwebel had come to a head, its shipments were the second highest monthly total in history to Textura. In all, Burlington's shipments during this period were at a rate of 35% more than the 1965 average. Only in June and July did Burlington's shipments fall below the 1965 average, and even then only to 83% of that average. Moreover, even during June and July, Burlington continued to ship the fabric style "Crown," which Powrie testified was an especially important style for Textura, at a rate between two and three times that of the 1965 average rate.[9]

It was only in August, *after* the settlement agreement between Clark-Schwebel and Textura had been reached, that Burlington's shipments took a downward

8. Burlington's total 1965 shipments to Textura amounted to 169,225 yards of fabric, and ranged from a monthly low of 9,041 yards in April to a high of 23,363 yards in September. (Pl. Ex. 829). The record does not show the dollar value of Burlington's monthly shipments, as it does for Clark-Schwebel, but there is no reason to believe that this difference results in any distortion of the year-to-year record of each company.

9. In 1965 Burlington shipped a total of 54,222 yards of "Crown" to Textura, for an average of roughly 4,500 yards a month. The shipments (in yards) of "Crown" for the first seven months of 1966 were as follows:

| | |
|---|---|
| January | 8,176 |
| February | 5,410 |
| March | 4,882 |
| April | 14,662 |
| May | 11,240 |
| June | 10,886 |
| July | 11,009 |

(Pl. Ex. 829)

plunge, ranging as follows during the last four full months of Textura's existence:

| | |
|---|---|
| August | 4,207 |
| September | –0– |
| October | 3,339 |
| November | 7,299 |

(Pl. Ex. 829)

It is undisputed that the primary reason for this latter decline—and particularly for the near drought of shipments of the key "Crown" fabric in the August to October period—was Burlington's temporary failure earlier in the year to accept new orders placed by Textura. Plaintiff suggests that this failure was part of the conspiracy, the effects of which did not become evident until some months after Clark-Schwebel's actions took their toll. However, this claim is unsupported. Indeed, the history of the orders and later events negates it. The orders, most important of which was for "Crown," were placed by Textura in March and April of 1966. It is clear that by May 18, 1966, Burlington's credit department had placed a "hold" on the orders, meaning that Burlington would not accept them for the time being.[10] However, this was more than three weeks prior to the first of a series of alleged "conspiratorial" conversations between Burlington and Clark-Schwebel (discussed below) which occurred on June 8. There is no evidence of collaboration on the part of Burlington prior to June 8 and certainly not as early as May 18. No conspiratorial significance, therefore, can be attached to this "hold."

The record, furthermore, is clear that Burlington alone made the decision to hold up approval of the new orders, and for its own independent reasons: at this point it was actively seeking a renewal of its personal guarantee from Powrie, and felt that he was reneging on a previous promise to give the guarantee. It cannot be disputed that he was rebuffing Burlington's efforts to obtain the guarantee at this point, and, indeed, on May 18 he wrote a letter to Burlington asking it to forego the guarantee because of an improvement in Textura's position. After the dispute between Textura and Clark-Schwebel was settled and Powrie had agreed to keep Textura's payments to Burlington within 60-day terms, the orders in question were accepted in late August, although in reduced amounts. In October and November, Burlington resumed shipments in increasing amounts to Textura, although the shipments did not reach the 1965 levels.

In sum, the record of the 1966 shipments by Burlington and Clark-Schwebel to Textura not only fails to support the claim of conspiracy but points in the opposite direction. The two companies followed wholly different policies in their sales of fabrics to Textura. Burlington had developed its policy long prior to the period of the alleged conspiracy and did nothing to change it in response to Clark-Schwebel's switch to a harder line. Indeed, Burlington's large shipments in the spring and summer would tend to undercut Clark-Schwebel's position.

Burlington took a further step which was the antithesis of conspiratorial conduct: on May 11, 1966, after Clark-Schwebel had in early March refused to weave new contracts for Textura, Textura placed an order with Burlington for a fabric style ("Homespun") which Textura had previously obtained exclusively from Clark-Schwebel. Burlington later accepted the order and wove 25,000 yards of the fabric.[11] Plaintiff, how-

10. Plaintiff suggests the evidence supports the inference that the orders were actually held up by Burlington's sales department, not its credit department, and thus the hold was part of the conspiracy. One bit of evidence cited in this regard—a memo from Jack Cann, a Burlington credit official, to a sales official (Pl. Ex. 147)—is only a request for a clarification of the status of the "Crown" contract. Similarly, the statement by another Burlington credit official that the sales department had told the credit department that weaving on "Crown" was suspended indicates only that the sales department had continued weaving the fabric for a period, even without credit approval of the new contract, a fact which is confirmed by other portions of the evidence. (E. g., Def. Ex. BN).

11. Textura also placed an order for another style ("Morro") formerly woven by Clark-Schwebel. While Burlington never wove any more than a small sample of this order, the reason is completely unclear. Mr. Powrie testified that "Morro" "kind of faded out of the picture" (Tr. 375), which is the only conclusion the evidence supports on the fate of the order.

ever, suggests that the poor resemblance of this woven fabric to the Clark-Schwebel product is itself evidence of a conspiracy, presumably implying that Burlington must have agreed with Clark-Schwebel to weave this fabric poorly in order to assure that Textura would not receive an adequate substitute for the "Homespun" which Clark-Schwebel would no longer provide.

While we must give the plaintiff the benefit of every reasonable inference, this argument leaps from inference into unbounded speculation, particularly in view of the fact that, when the quality problem with "Homespun" became evident, Burlington did not attempt to force the inferior fabric on Textura or otherwise use the contract as a tool to harass that company. Rather, it agreed to void the contract or, alternatively to sell the fabric to Textura at a closeout price of 75 cents a yard, as opposed to the 96 cents a yard contract price. The only reasonable inference which can be drawn from this episode is that Burlington was not conspiring with Clark-Schwebel, but was rather taking advantage of that company's dispute with Textura to try to capture some business previously enjoyed by Clark-Schwebel. That the expenditure involved in weaving "Homespun" ultimately proved to be wasted reflects on Burlington's technical abilities, but not on its motives for entering the transaction.

Burlington's willingness to make adjustments on the defective "Homespun" was not unusual; the company's attitude on quality complaints by Textura again stands in sharp contrast to Clark-Schwebel's position. While Clark-Schwebel's refusal to make what Textura deemed adequate adjustments of its quality complaints was a major factor precipitating the dispute between those two companies, Powrie testified that Burlington had been consistently more reasonable in making adjustments for defective fabrics. Textura does appear to have pressed quality complaints against Burlington with greater frequency in 1966 than previously, but the record does not support plaintiff's contention that Burling-

ton decided to put Textura out of business because of the increase in complaints. On the contrary, by Powrie's own testimony, Burlington offered him satisfactory quality adjustments on various fabrics as late as December of 1966.

*Credit Policies Toward Textura*

The credit policies of Burlington and Clark-Schwebel toward Textura likewise fail to support an inference of conspiracy. Not only did the credit policies of each supplier differ substantially but there is no evidence indicating that they were mutually formulated or invoked. In April 1965, long prior to the period of the alleged conspiracy, Burlington established its policy toward Textura, which was to continue to weave and warehouse orders without invoicing until the goods were called out and to extend credit on 90-day payment terms on invoiced goods, provided it had Mr. Powrie's personal guarantee. There is no evidence that Clark-Schwebel was involved in that decision, which was detailed in a contemporaneous memorandum (Def. Ex. BB) and confirmed by later 1965 memoranda.

Although Burlington took some steps to tighten its credit advances to Textura in 1966, the evidence shows that these actions were the result of Burlington's independent judgment and not the product of any conspiracy with Clark-Schwebel. Upon learning of Textura's reported loss for the year 1965 Burlington, beginning on January 5, 1966, and continuing from time to time throughout the year, unsuccessfully sought from Powrie a renewal of his personal guarantee. However, there is no evidence that these efforts were the result of any understanding with Clark-Schwebel. The fact that Burlington's efforts to obtain the guarantee continued in 1966 after Clark-Schwebel sought arbitration of its dispute with Textura hardly supports the existence of any collaboration between Burlington and Clark-Schwebel. As of May 31, 1966, some 10 days before the arbitration was filed, even Textura's unaudited internal figures showed the company had net working

capital of only some $43,000;[12] Clark-Schwebel's claim in arbitration was for $92,000, thus raising the distinct possibility that the arbitration proceeding could be the final blow collapsing Textura's admittedly thin financial structure.

Powrie himself conceded in his testimony that he worried about the effect of a dispute of this size upon his creditors, and had hesitated to bring an arbitration against Clark-Schwebel for that very reason: "Anything having to do with a $90,000 dispute against my company would have an effect [on its credit] no matter who brought it." (Tr. 665). The only conclusion that can be drawn is that it was reasonable for Burlington, in its own self-interest as a creditor, to worry about the arbitration, and to ask for a guarantee as a step to protect itself against Textura's possible bankruptcy.[13] See *Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8, 13–14 (9th Cir. 1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). Even assuming that the Burlington request for a guarantee could be considered parallel with Clark-Schwebel's earlier cut-off of credit that step, being in Burlington's individual economic interest, could not, without more, raise an inference of conspiracy. See *Modern Home Institute Inc. v. Hartford Accident & Indemnity Co.*, *supra*, 513 F.2d at 110; Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.Rev. 655, 658–59, 681 (1962).

For present purposes it is significant that, despite Burlington's increased efforts to get paid, which were natural and hardly conspiratorial under the circumstances, it continued for most of 1966 to weave and warehouse goods for Textura at its own risk, without invoicing Textura until the goods were called out, and except for occasional brief periods when it put Textura on cash terms,[14] to extend 60-day credit to Textura on invoiced goods. In contrast, beginning on March 1, 1966, and continuing through the rest of the year Clark-Schwebel refused to weave or sell on credit to Textura, it refused to ship except for cash and it billed Textura for all specially manufactured goods already held in inventory. Far from indicating any conspiracy to pursue common credit policies designed to drive Textura out of business, the picture is just the opposite, with one creditor (Clark-Schwebel) adopting a procrustean policy while the other (Burlington) sought through leniency to capture some of the business being given up by the first.

*Communications Between Burlington and Clark-Schwebel*

■ Plaintiff relies heavily on a series of telephone calls, primarily between Raymond Nordheim, Vice President of Clark-Schwebel, and Charles Kelly, an official in Burlington's credit department,[15] as evidencing a "classic conspiracy." It is argued that these conversations, which we have

12. The accuracy of these financial statements, which showed Textura made a net profit of $58,743.63 during the first five months of 1966, was disputed at trial, since Textura's bookkeeper admitted that sales made after the close of a period were sometimes booked during the period. The bookkeeper denied at trial that this was done as a policy to help Textura meet its goal of $150,000 a month in sales. A deposition in which she had previously admitted such a policy existed was read into the record. Since we must view the evidence most favorably to the plaintiff, we accept the financial statements at their face value.

13. None of the communications between Burlington and Clark-Schwebel contained any express request or suggestion by Clark-Schwebel that Burlington demand a guarantee. Nor, for

reasons to be discussed *infra*, can the communications be regarded as an implicit suggestion of joint action.

14. Powrie himself testified that Burlington put Textura on cash terms only for brief periods (Tr. 652–53, 698–99). Menardi & Co., another firm with which Textura dealt, also put Textura on a cash basis in 1966 (Tr. 699–700). Menardi is not alleged to have been a member of the conspiracy.

15. There was also evidence about other conversations between the pair before the conspiracy allegedly began. These conversations are also merely exchanges of credit information, and do not support the finding of a conspiracy.

summarized in the margin [16] could reasonably be interpreted by the jury as tacit invitations by Clark-Schwebel to Burlington to join in a coordinated credit policy toward Textura. We disagree. The exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the Sherman Act. See *Cement Manufacturers Protective Association v. United States*, 268 U.S. 588, 604, 45 S.Ct. 586, 591, 69 L.Ed. 1104, 1111 (1925). Unlike exchanges regarding prices, which usually serve no purpose other than to suppress competition and hence fall within the ban of the Sherman Act, see *United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), the dissemination to competitors of information concerning the credit-worthiness of customers aids sellers in gaining information necessary to protect themselves against fraudulent or insolvent customers. See *id.* at 335, 89 S.Ct. at 511, 21 L.Ed.2d at 528. *Cement Manufacturers Protective Assn. v. United States, supra,* 268 U.S. at 604, 45 S.Ct. at 591, 69 L.Ed. at 1111. Given the legitimate function of such data, it is not a violation of § 1 to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement.

The conversations concerning Textura do not support any inference that Clark-Schwebel and Burlington stepped beyond these permissible boundaries. The subject which bulked largest in the conversations—the progress of the arbitration proceeding—was a key factor in assessing Textura's future financial stability. While plaintiff points to testimony by Nordheim that he made the calls to Burlington to "protect" Clark-Schwebel, no such intention was expressly or tacitly communicated to Burling-

16. In the first telephone call, which occurred on June 8, 1966, Nordheim told Kelly that Clark-Schwebel was having "considerable difficulties" with Textura, which owed them $87,-000 and was being held to cash terms. Nordheim further described Textura as a "difficult and contentious" account because of the allegedly insubstantiated quality claims made, and indicated that Clark-Schwebel was thinking of submitting its disputes with Textura to arbitration. The day after this conversation Clark-Schwebel filed its arbitration demand. On June 30, some three weeks after the arbitration demand had been filed, Nordheim went into greater detail with Kelly about the dispute between Clark-Schwebel and Textura, indicating that the two companies were attempting to reach a settlement under which Textura would take delivery of and pay for warehoused goods over an extended period. Nordheim said Clark-Schwebel intended to be "very cooperative" and would accept any kind of "reasonable" delivery schedule. Nordheim also passed along information about a separate issue which had worried Textura's creditors for some time: the actual value of the rights to a process carried on Textura's balance sheet at $200,000. Nordheim said the item was worthless, since the owner of the process had cancelled his agreement with Textura.

In early July, 1966, Jack Schwebel, President of Clark-Schwebel, brought Kelly up-to-date about the development of the dispute between Clark-Schwebel and Textura, advising that Clark-Schwebel was no longer accepting orders from Textura. Kelly informed Schwebel that Burlington was requesting a personal guarantee from Powrie because of the arbitration proceeding.

In two conversations later in July, Nordheim advised Kelly that Clark-Schwebel was anxious to avoid proceeding with the arbitration, and would accept any reasonable settlement, but that Textura had thus far rejected their offers. Nordheim concluded the latter conversation by saying that if Clark-Schwebel was forced to proceed with the arbitration, it was confident of victory, and if victory was gained, Clark-Schwebel would "no longer be in the mood to compromise and will insist on immediate payment, which may very well bankrupt the account." For obvious reasons, this worried Kelly, who noted in his memorandum that "this matter should be taken into consideration in any further extension of credit on our part."

However, the next brief telephone call from Nordheim—*made at Powrie's request*—brought the news that a settlement had been agreed upon. The final conversation between Kelly and Nordheim took place on September 6, after Textura had defaulted on payments due to Clark-Schwebel. Nordheim informed Kelly of that fact, which prompted him to check and see if Textura had kept up its payments to Burlington. Finding that Textura had also defaulted on payments to his company, Kelly then ordered shipments held up until Textura was current in its obligations to Burlington. He also initiated inquiries with Textura's accountant to get more details about the company's current financial condition.

ton. At most the evidence of the talks indicates that, once or twice, Nordheim expressed some irritation at Textura's attitude. Viewed most favorably to the plaintiff, the conversations reveal that, while Clark-Schwebel told Burlington that its dispute with Textura could conceivably lead to a weakening of Textura's financial condition, with possible serious repercussions for both Burlington and Clark-Schwebel as creditors, Clark-Schwebel was offering concessions that it hoped would lead to settlement, which is exactly what happened. We cannot find these conversations, viewed with or without the balance of the evidence, sufficient to support the verdict.

### The Other Evidence

We have carefully reviewed the other evidence advanced at trial in support of the conspiracy claim, and find it cannot fairly be viewed as raising an inference of a conspiracy. The isolated statement of a Burlington official in 1964, two years before the alleged conspiracy, that he would be happier if Burlington did not deal with Textura, cannot be construed as an admission of participation in a conspiracy not claimed to have begun until years later, particularly in view of the fact that Burlington continued to do business with Textura up until the time of the latter's bankruptcy. Cf. *Scott Medical Supply Co. v. Bedsole Surgical Supplies Inc.*, 488 F.2d 934, 936 (4th Cir. 1974). Similarly, the complaints from Textura's competitors,[17] which are suggested as Burlington's motive for entering the conspiracy, were of long standing, yet Burlington had continued to deal with Textura for years. The suggestion that they suddenly provided a motive for Burlington to destroy Textura in 1966 thus ranks as utter speculation, see *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584, 588 (S.D.N.Y.1968), especially since Burlington made no effort to coerce Textura into

stopping the marketing methods which allegedly gave rise to the complaints. Cf. *Plastic Packaging Materials Inc. v. Dow Chemical Co.*, 327 F.Supp. 213, 228 (E.D.Pa. 1971). In sum, the evidence does not reasonably support a finding of any motivation on Burlington's part to enter a conspiracy against Textura. This absence of a motive further undermines plaintiff's suggested inference that Burlington's tightening of credit policy toward Textura was prompted by agreement with Clark-Schwebel, rather than by its own business judgment. See *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 287, 88 S.Ct. 1575, 1591, 20 L.Ed.2d 569, 591 (1968); *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1314–15 (3d Cir. 1975).

Our discussion of those portions of the proof emphasized by the parties does not mean that we have limited ourselves to pieces of the mosaic without viewing the evidentiary picture as a whole. See *Continental Ore Co. v. Union Carbide & Carbon Corp., supra*, 370 U.S. at 698–99, 82 S.Ct. at 1409–10, 8 L.Ed.2d at 783–84. But even when the evidence is viewed as a whole, the picture is not even dimly one of conspiracy. In view of this conclusion, we find it unnecessary to rule upon appellants' contentions that there was insufficient evidence that their conduct caused Textura to cease business and that the award of damages was therefore based on speculation rather than on proof. Similarly, we need not pass upon appellants' claims of error regarding the conduct of the trial.

The judgment based upon the alleged conspiracy to drive Textura out of business is reversed, with instructions to enter judgment for the defendants on this claim. In view of this disposition the appeal and cross-appeal from the district court's award of attorneys' fees in Docket Nos. 75–7593, 75–7954 are dismissed as moot.

---

17. The companies in question were jobbers of fabrics. It might be questioned how significant the competition between these firms and Textura was, since plaintiff himself introduced considerable evidence to show that Textura had profited by entering a market previously occupied by venetian blind manufacturers.