PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2818
_____

JEOFFREY L. BURTCH, Chapter 7 Trustee,
Factory 2-U stores, Inc., et al.
Appellant

v.

MILBERG FACTORS, INC.; CAPITAL FACTORS, INC.;
THE CIT GROUP/COMMERCIAL SERVICES, INC.;
GMAC COMMERCIAL FINANCE, LLC;
HSBC BUSINESS CREDIT (USA), INC.;
ROSENTHAL & ROSENTHAL, INC.;
STERLING FACTORS CORPORATION;
WELLS FARGO CENTURY, INC.
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF DELAWARE
_____

(D.C. Civ. Action No. 1:07-cv-00556)
District Judge: Honorable Joseph J. Farnan
_____

Argued on April 28, 2011

1

_____

Before: SLOVITER, GREENAWAY, JR., and ROTH,
*Circuit Judges*.

(Opinion Filed: October 24, 2011)

_____

Joseph D. Mancano (argued)
J. Peter Shindel Jr.
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19103
        *Counsel for Appellant*

Celia Goldwag Barenholtz (argued)
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036
        *Counsel for Appellee HSBC Business Credit (USA),*
*Inc.*

Bernard Beitel (argued)
Daniel Wallen
Lloyd M. Green
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, NY 10169
        *Counsel for Appellee Wells Fargo Century, Inc.*

Ashley B. Stitzer

Stephen B. Brauerman
Bayard, P.A.
222 Delaware Avenue, Suite 900
Wilmington, DE 19899
    *Counsel for Appellee HSBC Business Credit (USA),*
*Inc.*

Denise Seastone Kraft
K. Tyler O'Connell
Edwards Angell Palmer & Dodge LLP
919 N. Market Street, Suite 1500
Wilmington, DE 19801
    *Counsel for Appellee Wells Fargo Century, Inc.*

C. Barr Flinn
Elena C. Norman
Karen E. Keller
Monté T. Squire
Young Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
    *Counsel for Appellee Rosenthal & Rosenthal, Inc.*

Gregory A. Inskip
David J. Baldwin
Porter Anderson & Corron LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899
    *Counsel for Appellee Capital Factors, Inc.*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

Jeoffrey L. Burtch ("Burtch" or "Appellant"), Chapter 7 Trustee of Factory 2-U Stores, Inc. ("Factory 2-U"), appeals the District Court's May 31, 2009 Order granting Defendants' Motion to Dismiss as well as the District Court's June 4, 2010 Order denying leave to amend Burtch's Complaint. Capital Factors, Inc. ("Capital"), HSBC Business Credit ("HSBC"), Rosenthal & Rosenthal, Inc. ("Rosenthal"), and Wells Fargo Century, Inc. ("Wells Fargo"), collectively ("Appellees," "Defendants," or "Factors")[1] are "factors" who play a role in financing purchase and sale transactions between garment retailers, such as Factory 2-U, and garment manufacturers. According to Appellant, the Factors (1) shared credit information among themselves regarding Factory 2-U, (2) unlawfully agreed to the terms upon which they would do business with Factory 2-U, and (3) at approximately the same time, worsened the terms on which the Factors would provide financing services to Factory 2-U.

Based on these assertions, Appellant sued the Factors under Section 1 of the Sherman Act for illegal price fixing

---

[1] The complaint originally included Capital; HSBC; Rosenthal; Wells Fargo; Milberg Factors Inc ("Milberg"); CIT Group Commercial Services, Inc. ("CIT"); GMAC Commercial Finance LLC ("GMAC"); and Sterling Factors Corporation ("Sterling") as defendants (collectively, the "original Defendants"). The parties have stipulated to the dismissal of Milberg, CIT, GMAC, and Sterling.

and illegal group boycott and sought leave to amend his Complaint. The District Court ruled that Appellant did not adequately plead his Section 1 claims and that Appellant's motion seeking leave to amend should be denied. The question on appeal is whether Appellant adequately pled claims under Section 1 of the Sherman Act and whether the District Court abused its discretion in denying Appellant leave to amend. We will affirm.

## I. <u>BACKGROUND</u>

The garment industry is comprised of three categories of participants—garment manufacturers,[2] garment retailers, and factors. Garment retailers purchase inventory from garment manufacturers to sell to their customers. Factors play a role in the garment industry by assuming the garment manufacturers' risk of liability with respect to the amount owed by the garment retailers. Factors assume risk by purchasing garment manufacturers' accounts receivable for those garment retailers that the factor approves.

If a factor declines to assume the risk of collecting the accounts receivable from a particular garment manufacturer based on the factor's determination of the garment retailer's "creditworthiness," the risk of any sale by the garment manufacturer to this garment retailer remains with the garment manufacturer. Garment manufacturers are typically unable to make sales to garment retailers for which the factor declines to assume the risk. Consequently, the factor's credit check decision effectively determines whether or not sales between the garment manufacturer and the garment retailer

---

[1] The term "garment manufacturer" includes garment wholesalers as well.

5

are made. As a result, garment manufacturers are unable to sell materials to garment retailers due to an inability to quickly convert accounts receivable into cash and the garment retailer is left with insufficient inventory to sell to its retail customers. Additionally, factors determine the terms and conditions, including the discount rate at which factors will purchase receivables from manufacturers who are owed by retailers, payment terms required of retailers, and whether purchases by particular retailers will be financed.

Factory 2-U, a garment retailer, was a major discount clothing retailer that operated more than 200 stores in ten states. Factors competed with one another to provide credit to Factory 2-U, through the purchase of garment manufacturers' accounts receivable, so that Factory 2-U could, in turn, purchase inventory from various garment manufacturers to sell to its customers. In fiscal 2001 and 2002, Factory 2-U had sub-par operating performance and declining sales volume. Between 2002 and 2003, Factors declined to extend credit to Factory 2-U. At that time, Factory 2-U's access to credit was more costly and was, at times, cut off all together. Without credit, Factory 2-U's ability to purchase inventory from garment manufacturers decreased. The company's costs increased, its profitability and sales decreased, and ultimately, Factory 2-U filed for bankruptcy on January 13, 2004.

Here, the parties dispute whether the Factors' decision to decline to extend credit to Factory 2-U was a result of a conspiracy among the Defendants. At the time of the Complaint, approximately 80% of all garment manufacturers relied on factors for their credit needs. In fact, the original Defendants acted as factors to 305 of Factory 2-U's garment manufacturers.

6

The crux of the Complaint is that the Factors here engaged in "cartel-like behavior." (Compl. ¶ 34.) According to the Complaint, they unlawfully exchanged information and entered into illegal agreements with one another at highly-secretive weekly meetings and through telephone conversations. Between February 27, 2002 and September 17, 2003, the Factors exchanged credit information about Factory 2-U through at least 27 telephone conversations. Through these telephone conversations, the Factors exchanged information about the Factors' existing credit limits with Factory 2-U, individual Factors' decisions to decline credit or withhold orders to Factory 2-U, and decisions to maintain, approve, or increase Factory 2-U's credit limit.

As a result of their allegedly "unlawful discussions and communications, the Defendants . . . . declined and limited credit to Factory 2-U at approximately the same time . . . . [and] based their future course of action on their previously unlawful communications and discussions." (Id. ¶ 37.) Resulting from these telephone conversations were "agreements" on: "whether credit would be extended by Defendants to Factory 2-U for its purchases from garment manufacturers;" "the amount of credit that would be extended by Defendants to Factory 2-U;" "the terms on which credit would be extended;" and "whether surcharges would be imposed by Defendants on garment manufacturers as a condition of financing Factory 2-U's purchases from those manufacturers." (Id. ¶ 38.)

The Factors ostensibly used these "unlawful means" to "(1) minimize their risks and cost of doing business with garment manufacturers and their customers; (2) maintain and stabilize pricing structures for factoring services; and (3)

7

stabilize their respective market shares . . . ." (Id. ¶ 33.) As a result of the Factors' agreement to decline or refuse to extend credit to Factory 2-U, competition between garment retailers decreased. After the Factors declined credit to Factory 2-U, its credit costs increased and it did not have sufficient inventory to conduct business. Factory 2-U suffered a loss in profits.

On January 13, 2004, Factory 2-U filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware. On January 27, 2005, the bankruptcy case was converted to a Chapter 7 case and Burtch was appointed as interim trustee, pursuant to Section 701 of the Bankruptcy Code, and is serving as Trustee of the estate pursuant to Section 702(d) of the Bankruptcy Code.

On September 17, 2007, Burtch filed a complaint against the original Defendants, pleading violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1") and unlawful restraint of trade under the New York State Donnelly Act, N.Y. Gen. Bus. Law §§ 340-47. Burtch alleges three Section 1 claims: (1) *per se* unlawful price-fixing; (2) *per se* unlawful group boycott; and (3) an anticompetitive agreement violating the rule of reason.

On December 14, 2007, CIT moved to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under Section 1 of the Sherman Act and the New York Donnelly Act. On December 17, 2007, GMAC, Sterling, and Century jointly moved to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6) and on the basis that the Complaint was time-barred. Within three days, Rosenthal, Milberg, HSBC, and Capital each

8

separately moved to dismiss. Magistrate Judge Leonard P. Stark held a hearing on all the pending motions on October 20, 2008.

On March 30, 2009, the Magistrate Judge issued a Report and Recommendation ("R&R") recommending that Defendants' Motions to Dismiss be granted. The Magistrate Judge based his conclusion on Appellant's failure to allege its Section 1 claims under the following principles established in Bell Atlantic v. Twombly, 550 U.S. 544 (2007): (1) a Section 1 claim may not be predicated solely on allegations of parallel conduct by the defendants; (2) conclusory assertions of an unlawful agreement are insufficient and the complaint must set forth specific factual allegations of an agreement; and (3) the plaintiff fails to state a claim where the defendants' alleged conduct may just as likely be the result of wholly lawful independent reactions to common economic stimuli.

According to the R&R, Appellant's allegations did not satisfy the requisite pleading standard because, assuming that Appellant had alleged parallel conduct, Appellant still did not proffer additional well-pleaded factual allegations to indicate the existence of an agreement between the Defendants to fix credit terms.

The Magistrate Judge emphasized that

> At best, the Plaintiff has alleged that the Defendants might have reached an agreement to limit or decline credit to Factory 2-U and then acted on that agreement by doing just that, at approximately the same time as one another.

9

> However there is no factual detail in the Complaint that makes it any more likely that the Defendants' parallel conduct was the result of an unlawful agreement than, instead, the result of independent rational, and wholly lawful decisions by each Defendant to limit its exposure to Factory 2-U's deteriorating financial condition.

(App. at 28.) The Magistrate Judge rejected Appellant's conclusory allegations of an agreement and rejected Appellant's theory that the exchange of future credit information without an agreement to fix credit terms was adequate to survive a motion to dismiss for a Section 1 claim. Appellant's New York Donnelly Act claim was also recommended for dismissal because the claim was patterned after the Sherman Act claim.

The Trustee timely filed objections to the R&R, requesting that the District Court deny the Motion to Dismiss, or alternatively, grant leave to file an amended complaint. On May 31, 2009, the District Court issued an Order overruling the Trustee's objections, adopting the R&R, and dismissing the Complaint. The District Court applied Twombly and the two-step approach set forth in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009), rejecting Appellant's conclusory allegations and determining whether the well-pleaded factual allegations plausibly gave rise to an entitlement to relief. Based on essentially the same reasoning as the R&R, the District Court held that the Complaint did not pass muster under Twombly and Iqbal.

10

After the District Court's entry of its Order dismissing the Complaint, Burtch brought a Motion to Alter or Amend Judgment under Federal Rules of Procedure 59(e) and 15(a). Burtch included a Proposed Amended Complaint ("PAC") with its Motion. The PAC pled the same violations of Section 1 of the Sherman Act as the original Complaint for illegal price fixing, illegal group boycott, a rule of reason claim, and unlawful restraint of trade under the New York State Donnelly Act. The PAC also included an additional rule of reason claim for illegal information sharing.

In addition to the 27 telephone conversations that Burtch pled in the original Complaint, the PAC alleges 33 more telephone conversations amongst the original Defendants. The additional 33 conversations, much like the conversations in the original Complaint, are allegations that the Factors exchanged information about existing credit limits with Factory 2-U as well as their individual decisions to decline credit or withhold orders. Included in the additional allegations is information regarding Factory 2-U's delayed payments to individual Factors. The PAC expanded upon the original Complaint by adding allegations of the status of the Defendants' credit lines to Factory 2-U in January 2002, prior to any known alleged collusion, in July 2003, and in November and December 2003 when Factory 2-U was forced out of business.[3]

---

[3] The PAC alleges that in January 2002, Defendants' credit lines to Factory 2-U were as follows: CIT had a credit line of $10 million; HSBC had a credit line of $5 million; GMAC had a credit line of $4.5 million; Rosenthal had a credit line of $1 million; Sterling had a credit line of $500,000; Milberg had a credit line of $1.3 million; Capital had a credit line of

On June 4, 2010, the District Court denied the Motion, declining to re-open the judgment and denying leave to amend. The District Court concluded that Rule 59 governs post-judgment requests for leave to amend and Burch failed to allege any of the requirements of Rule 59(e). Burch filed a timely appeal.

## II. **JURISDICTION AND STANDARD OF REVIEW**

We exercise plenary review of the District Court's grant of a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6). Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (citation omitted). The District Court's denial of a motion to amend, pursuant to Federal Rule of Civil Procedure 15(a), is reviewed for abuse of discretion. Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir.

---

$4.5 million; and Wells Fargo had a credit line of $2 million. At the end of July 2003, the purported credit lines were as follows: CIT had a credit line of $4 million, backed by a $2.5 million letter of credit; HSBC had pulled its credit line; GMAC was approving orders on an *ad hoc* basis with no formal credit line; Rosenthal had pulled its credit line; Sterling had a credit line of $250,000, reduced from $750,000; Milberg had a credit line of $250,000, reduced from $750,000; Capital had pulled its credit line; and Wells Fargo had pulled its credit line. In November and December 2003, the credit lines were as follows: CIT had a credit line of $2 million; HSBC had pulled its credit line; GMAC had pulled its credit line and was no longer approving orders; Rosenthal had pulled its credit line; Sterling had pulled its credit line; Milberg had pulled its credit line; Capital had pulled its credit line; and Wells Fargo had pulled its credit line.

2008). We review the District Court's denial of a Rule 59(e) motion to amend the complaint for abuse of discretion, In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 280 (3d Cir. 2004), but we review the District Court's underlying legal determinations de novo and factual determinations for clear error, Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 246 (3d Cir. 2010).

## III. ANALYSIS

### 1. Motion to Dismiss

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) requires "only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (citation and internal quotation marks omitted) (alteration in Twombly). When reviewing a motion to dismiss, we construe the complaint "in the light most favorable to the plaintiff." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010) (citations and internal quotation marks omitted).

The Supreme Court in Twombly set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim

13

to relief that is plausible on its face." Twombly, 550 U.S. at 570. A complaint satisfies the plausibility standard when the factual pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." Id. A complaint which pleads facts "'merely consistent with' a defendant's liability, [] 'stops short of the line between possibility and plausibility of 'entitlement of relief.'" Id. (citing Twombly, 550 U.S. at 557).

To determine the sufficiency of a complaint under Twombly and Iqbal, we must take the following three steps:[4]

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

---

[4] Iqbal describes the process as a "two-pronged approach" but the Supreme Court took note of the elements a plaintiff must plead to state a claim before proceeding to its two-step approach. In Santiago, this Circuit deemed the process a three-step approach. 629 F.3d at 130.

14

Santiago, 629 F.3d at 130 (quoting Iqbal, 129 S. Ct. at 1947, 1950); see also Great Western Mining & Min. Co. v. Rothschild LLP, 615 F.3d 159, 177 (3d Cir. 2010).

### a. The Elements of Burtch's Claim

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. An antitrust plaintiff must plead the following two elements: (1) "that the defendant was a party to a contract, combination . . . or conspiracy" and (2) "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." Ins. Brokerage, 618 F.3d at 315 (citation and internal quotation marks omitted).

The first element—a contract, combination, or conspiracy—requires "'some form of concerted action,'" which we define as "'unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme.'" Id. (citing In re Baby Food Antitrust Litig., 166 F.3d 112, 117 (3d Cir. 1999); In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004)). In other words, Section 1 claims always require "the existence of an agreement." Id. (citations and internal quotation marks omitted); see also Howard Hess, 602 F.3d at 254 ("Section 1 claims are limited to combinations, contracts, and conspiracies and thus always require the existence of an agreement."); West Penn Allegheny Health Sys. v. UPMC, 627 F.3d 85, 99 (3d Cir. 2010) ("To prevail on a section 1 claim . . . a plaintiff must establish the existence of an agreement."). Unilateral action, regardless of the motivation,

15

is not a violation of Section 1. Ins. Brokerage, 618 F.3d at 321.

The second requirement of a Section 1 claim, an unreasonable restraint on trade, is analyzed under either the *per se* standard or the rule of reason standard. The *per se* illegality rule applies when a business practice "on its face, has no purpose except stifling competition." Eichorn v. AT&T Corp., 248 F.3d 131, 143 (3d Cir. 2001). Agreements that fall under established *per se* illegality categories are "conclusively presumed to unreasonably restrain competition." Ins. Brokerage, 618 F.3d at 316 (citation and internal quotation marks omitted). "Paradigmatic examples are 'horizontal agreements among competitors to fix prices or to divide markets.'" Id. (citing Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007)); see also Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211-12 (1959) (group boycotts are *per se* violations of the Sherman Act). *Per se* illegality "is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010) (citations and internal quotation marks omitted); Ins. Brokerage Antitrust Litig., 618 F.3d at 317 ("If the court determines that the restraint at issue is sufficiently different from the *per se* archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed." (citations omitted)).

Agreements that do not fall under *per se* illegality are analyzed under the "rule of reason" to determine whether they are an unreasonable restraint on trade. Under the rule of reason analysis, "the plaintiff 'bears the initial burden of showing that the alleged [agreement] produced an adverse,

16

anticompetitive effect within the relevant geographic market.'" Id. at 315 (quoting Gordon v. Lewistown Hosp., 423 F.3d 184, 210 (3d Cir. 2005)). Satisfying this burden typically includes "a demonstration of defendants' market power." Id. (citation omitted).

Here, Appellant erroneously contends that the mere exchange of future credit information is a *per se* price-fixing claim or group boycott claim on the following three premises: (1) the case law that has held that the exchange of credit information is not *per se* unlawful applies only to the exchange of *historical* credit information and not *future* credit information; (2) discussions about the creditworthiness of customers are equivalent to discussions about the prices offered to customers; and (3) the mere exchange of price information is *per se* unlawful. All three of these assertions are flawed.

First, Appellant's opening salvo is incorrect. Exchanging information regarding the creditworthiness of customers does not violate the Sherman Act. Cement Mftrs. Protective Ass'n v. United States, 268 U.S. 588, 599-600 (1925). The Supreme Court has stated that the mere exchange of credit information without "any understanding on the basis of which credit has to be extended to customers or that any co-operation resulted from the distribution of this information, or that there were any consequences from it other than such as would naturally ensue from the exercise of the individual judgment of manufacturers in determining, on the basis of available information, whether to extend credit" does not violate the Sherman Act. Catalano v. Target, 446 U.S. 643, 648 n.12 (1980) (quoting Cement Mfrs, 268 U.S. at 600); see also Zoslaw v. MCA Distributing Corp., 693 F.2d 870, 885-86 (9th Cir. 1982) (holding that the exchange of

credit information is not a *per se* violation of Section 1 of the Sherman Act, but "*assuming* plaintiff could prove that the defendants agreed to fix credit terms to their customers, such an agreement would be a *per se* violation of section 1"); Michelman v. Clark-Schwebel Fiber Glass Co., 534 F.2d 1036, 1048 (2d Cir. 1976) (holding that "[g]iven the legitimate function of [the creditworthiness of customers], it is not a violation of § 1 to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement").

Appellant attempts to distinguish Cement Manufacturers and Michelman by arguing that these cases only permitted the exchange of *historical* credit information and that this case is governed by Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975), which Appellant asserts prohibited the exchange of *forward*-looking price information. Appellant's interpretation of Cement Manufacturers, Michelman, and Goldfarb is incorrect. The basis for the holdings in Cement Manufacturer and Michelman was not whether the information exchanged was historical or future, but whether any agreement to extend or refuse credit resulted from the information. See Cement Mftrs., 268 U.S. at 599-600; Michelman, 534 F.2d at 1048.

Contrary to Appellant's position, Goldfarb does not suggest that the forward-looking nature of the information, as distinguished from historical information, is a violation of the Sherman Act. 421 U.S. at 781. In Goldfarb, the county bar association published a minimum fee schedule which "did not concern past standards, but rather minimum fees to be charged in future transactions." Id. The Court determined that this was price-fixing, however not as Appellant suggests, because of the forward-looking nature of the information.

18

Rather, the Court explained that "[t]his is not merely a case of an agreement that may be inferred from an exchange of price information, for here a naked agreement was clearly shown, and the effect on prices is plain." Id. at 782. The basis of the Court's holding was whether the defendants had an agreement to fix prices.

Second, contrary to Burtch's position, credit information and price are distinct. Burtch relies on the statement in Catalano that "credit terms must be characterized as an inseparable part of price." 446 U.S. at 648. However, Appellant mischaracterizes Catalano. Catalano did not suggest that price information and credit information are equivalent for purposes of antitrust violations. It held that an agreement to temporarily extend interest-free credit was "equivalent to giving a discount equal to the value of the use of the purchase price for that period of time." Id. at 648.

Thus, we do not conclude based on Catalano that sharing information regarding the creditworthiness of a defendant without an agreement should be treated the same as discussions concerning price. See Zoslaw, 693 F.2d at 886 (explaining that Catalano did not suggest that all exchange of credit information is a *per se* violation and that it permitted the "exchange of credit information for the individual use of each member in determining whether to exercise credit"). Exchanges regarding price typically serve no other purpose than to suppress competition and violate the Sherman Act; conversely, information concerning the creditworthiness of customers can protect competitors from insolvent customers. See, e.g., Michelman, 534 F.2d at 1048.

Third, even if we did assume that price and credit information are indistinct, the exchange of price information

19

still requires showing that the defendants had an agreement. The Supreme Court has made clear that "the dissemination of price information is not itself a *per se* violation of the Sherman Act." United States v. Citizens & So. Nat'l Bank, 422 U.S. 86, 113 (1975) (citation omitted); see also United States v. Gypsum Co., 438 U.S. 422, 441 n.16 (1978) (holding that "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effect . . . we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act").

Burtch relies on the Supreme Court's decision in United States v. Container Corporation, 393 U.S. 333 (1969), for the proposition that the exchange of information concerning prices is a *per se* violation, regardless of the existence of any agreement. In Container Corporation, the Supreme Court held that the exchange of price information amongst container manufacturers who accounted for about 90 percent of the shipments in a certain area violated Section 1 of the Sherman Act. The container industry operated such that the containers were substantially identical, no matter who produced them, when made to particular specifications. Assuming costs stayed the same, a defendant would naturally quote the same price on additional orders. However, as a result of the exchange of price information, where a competitor was charging a lower price, the defendant manufacturer would quote the same price or lower.

Thus, in Container Corporation the exchange of price information had the effect of stabilizing prices at a downward level since "knowledge of a competitor's price usually meant matching that price" and, contrary to Appellant's position here, the defendants had an "agreement," even if it was, as the

20

Supreme Court described, "somewhat casual." 393 U.S. at 336-37. While concluding that the particular facts in Container Corporation led to a violation of the Sherman Act, the Supreme Court cautioned that "[p]rice information exchanged in some markets may have no effect on a truly competitive price." Id. at 337. Container Corporation provides no solace to Appellant.

**b. The Allegations That Are Not Entitled To The Assumption Of Truth**

Under Iqbal, we next identify allegations that "are no more than conclusions, [and] are not entitled to the assumption of truth . . . [and] disregard naked assertions . . . ." Santiago, 629 F.3d at 131 (quoting Iqbal, 129 S. Ct. at 1949, 1950). "[M]ere restatements of the elements of [a] claim[] . . . are not entitled to the assumption of truth." Id. In Twombly, the Court rejected the plaintiff's bare assertions that "in light of the parallel course of conduct that each engaged in to prevent competition . . . [appellants] have entered into a contract, combination or conspiracy to prevent competitive entry" in the industry. 550 U.S. at 551; see also Iqbal, 129 S. Ct. at 1951 (rejecting bald assertions that petitioners "knew of, condoned, and willfully and maliciously" agreed to subject plaintiff to harsh conditions of confinement); Santiago, 629 F.3d at 131-32 (concluding that a recitation of the elements of supervisor liability was not entitled to an assumption of truth); Great Western Mining Co., 615 F.3d at 178 ("Applying Twombly, Great Western's statement that Defendants engaged in a concerted action of a kind not likely to occur in the absence of agreement is inadequate to properly plead an agreement.").

Burtch contends that the Appellants "regularly and

unlawfully shared highly confidential information relating to factored customers and clients, and then reached illegal agreements regarding the terms and conditions of credit to be extended." (Compl. ¶ 34.) Appellants allegedly "declined and limited credit to Factory 2-U at approximately the same time" and "acted in concert when limiting or refusing to extend credit to Factory 2-U." (Id. ¶¶ 37, 47.)

In light of the conclusory nature of these allegations, they are not entitled to assumptions of truth. See Twombly, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). We further reject bare statements that the Defendants purportedly "conspired and agreed among themselves" to "fix, maintain, and stabilize Factory 2-U's terms and amount of credit" and "boycott Factory 2-U from the garment retailer business." (Compl. ¶¶ 44, 47, 50); see also Twombly, 550 U.S. at 556 ("[A] bare assertion of conspiracy will not suffice.").

### c. The Plausibility Of Burtch's Claims

Finally, Iqbal requires courts to determine whether the well-pleaded facts state a plausible claim for relief. 129 S. Ct. at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Santiago, 629 F.3d at 128.

Burtch alleges that Appellant's conduct was a (1) *per se* illegal price fixing agreement; (2) a *per se* illegal group boycott; and (3) a conspiracy violating the rule of reason. Claims subject to both the *per se* analysis and the rule of reason require alleging the existence of an agreement. See

22

Ins. Brokerage, 618 F.3d at 315. To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement or circumstantial evidence. Id. at 320-21. The question then becomes whether these alleged facts make it plausible that Appellees had an agreement to fix credit terms. This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950 (citation omitted).

In the case before us, the factual allegations that Burtch puts forth in the Complaint include "highly-secretive weekly meetings of formal groups, " (Compl. ¶ 34), at least 27 alleged telephone conversations between the original Defendants regarding the creditworthiness of Factory 2-U and individual Factors' credit terms with Factory 2-U. Defendants, according to the Complaint, discussed their individual decisions to decline credit or withhold orders to Factory 2-U and decisions to maintain, approve, or increase the credit limit. As a result of the dominant market power of the original Defendants, this purported illegal concerted action led to an inability of Factory 2-U to obtain credit. According to Burtch, the Appellees' actions led to a loss in profits and ultimately bankruptcy for Factory 2-U.

i.     *Direct Evidence of an Agreement*

Direct evidence of a conspiracy is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." Ins. Brokerage, 618 F.3d at 324 n.23 (quoting Baby Food, 166 F.3d at 118). Appellant does not allege direct evidence that the Defendants had an agreement or "a conscious commitment to a common scheme." Id. at 315 (citation and internal quotation marks

23

omitted). Instead of alleging direct evidence, the Complaint alleges telephone conversations regarding Factory 2-U's creditworthiness and whether the individual Factors would decline or extend credit. Yet, none of these allegations specify a time or place that any actual agreement to fix credit terms occurred, nor do they indicate that any particular individuals or Factors made such an agreement. See Twombly, 550 U.S. at 565 n.10 (explaining that the plaintiff's failure to allege a "specific time, place, or person involved in the alleged conspiracies" left "no clue as to which of the [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place"); see also Great Western, 615 F.3d at 179 ("Great Western has failed to allege except in general terms the approximate time when the agreement was made, the specific parties to the agreement (i.e., which [defendants]), the period of the conspiracy, or the object of the conspiracy."); Ins Brokerage, 618 F.3d at 324 n.23 ("A document or conversation explicitly manifesting the existence of the agreement in question" is an example direct evidence.).

In fact, nowhere in the Complaint does Burtch plead any direct evidence of an agreement to withhold credit or provide credit on similar terms. Cf. West Penn., 627 F.3d at 100 (finding allegations of a letter between the defendants and the CEO's admission of concerted action against the plaintiff as adequate allegations of direct evidence on the agreement element). The Complaint itself notes that the "precise scope and duration of the Factory 2-U discussions and agreements are at present unknown," (Compl. ¶ 35), and that there is "no written record" of the telephone conversations, (Id. ¶ 40).

Appellant argues that these 27 alleged conversations

24

suffice as direct evidence on the theory that the mere exchange of future information is enough to constitute a violation of the Sherman Act. Appellant's position is without merit. As discussed in the previous section, the mere exchange of credit information, without an agreement, does not violate Section 1 of the Sherman Act. See Cement Mftrs., 268 U.S. at 599-600; Zoslaw, 693 F.2d at 885-86; Michelman, 534 F.2d at 1048. To state a plausible claim for Section 1, the plaintiff must allege that the defendants had an agreement to fix credit terms regarding Factory 2-U. See Ins. Brokerage, 618 F.3d at 315.[5] Here, Appellant failed to plead direct evidence of an agreement.

## ii. *Circumstantial Evidence of an Agreement*

In light of Burtch's failure to allege direct evidence of an agreement, we now must determine whether the Complaint contains allegations of circumstantial evidence to plausibly

---

[5] Appellant contends that Watson Carpet & Floor Covering, Inc. v. Mohawk Ind., Inc., 648 F.3d 452 (6th Cir. 2011), supports his position. In that case, the Sixth Circuit reversed the District Court's dismissal of an antitrust complaint, stating that "[o]ften, defendants' conduct has several plausible explanations [and] [f]ettering out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." Id. at 458. Contrary to Appellant's assertion that this principle was misapplied by the District Court, Watson is clearly distinguishable from the case sub judice. In Watson, plaintiff "articulated in detail the facts of the 1998 agreement," id., whereas Burtch has not alleged facts of a specific agreement.

25

show the existence of an agreement.  Circumstantial evidence of parallel behavior must be pled in "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Twombly, 550 U.S. at 557.  The law is well-established that "evidence of parallel conduct by alleged co-conspirators is not sufficient to show an agreement."  Ins. Brokerage, 618 F.3d at 321; see also Twombly 550 U.S. at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

Conscious parallelism, "a common reaction of 'firms in a concentrated market [that] recognize[e] their shared economic interests and their interdependence with respect to price and output decisions'" does not suffice as an agreement under Section 1.  Twombly, 550 U.S. at 553-54 (alterations in Twombly).  Alleging parallel conduct "is thus much like a naked assertion of conspiracy in a § 1 complaint:  it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief."  Id. at 557 (citation and internal quotation marks omitted).  Parallel conduct in itself is insufficient to state a plausible claim because it is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  Id. at 554.

When relying on circumstantial evidence to sufficiently plead the existence of an agreement, we have identified at least three types of facts, often referred to as "plus factors," that tend to demonstrate the existence of an agreement: "(1) evidence that the defendant had a motive to

26

enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." Ins. Brokerage, 618 F.3d at 321-22 (citation and internal quotation marks omitted).

We have cautioned that the first two plus factors may indicate that "defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." Id. at 322 (citation omitted); see also Baby Food, 166 F.3d at 135 ("[E]vidence of action that is against self-interest or motivated by profit must go beyond mere interdependence."). Evidence of the third plus factor is "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." Ins. Brokerage, 618 F.3d at 322 (citation and internal quotation marks omitted).

Requiring plausibility to infer an agreement from circumstantial evidence "does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 556. In Twombly, the plaintiffs contended that they alleged circumstantial evidence that the defendants had violated Section 1 in two ways. First, the defendants allegedly engaged in parallel conduct to inhibit the growth of the defendants by making unfair agreements for access to the plaintiffs' networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage plaintiffs' customer relations. Id. at 550-51.

27

Second, the defendants allegedly refrained from competing with one another. Id. at 551.

The Court rejected the plaintiffs' first theory because nothing indicated that the resistance to the plaintiffs "was anything more than the natural, unilateral reaction of each [defendant] intent on keeping its regional dominance." Id. at 566. Resisting competition was "routine market conduct" and there was "no reason to infer that the companies had agreed among themselves to do what was only natural anyway." Id. Similarly, the Court determined that when "viewed in light of common economic experience," plaintiffs failed to sufficiently allege facts for the second theory and the complaint's allegations that the defendant's actions were independently motivated. Id. at 565. In pleading both theories, defendants' parallel conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." Iqbal, 129 S. Ct. at 1950 (explaining Twombly).

Appellant argues that the Magistrate Judge improperly applied a "probability" rather than the requisite "plausibility" standard in resolving Appellant's claim and that the District Court incorrectly adopted the approach in the R&R. This argument is based on the Magistrate Judge's contention that

> At best, the Plaintiff has alleged that the Defendants might have reached an agreement to limit or decline credit to Factory 2-U and then acted on that agreement by doing just that, at approximately the same time as one another. However there is no factual detail

28

in the Complaint that makes it any more likely that the Defendants' parallel conduct was the result of an unlawful agreement than, instead, the result of independent rational, and wholly lawful decisions by each Defendant to limit its exposure to Factory 2-U's deteriorating financial condition.

(App. at 28.) Yet, the Magistrate Judge mirrored his reasoning after Twombly's proposition that parallel conduct is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." 550 U.S. at 554. Twombly further required allegations "be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Id. at 557. Based on Twombly, we disagree with Burtch's assertion that the R&R adopted by the District Court applied a probability, rather than a plausibility, standard.

In this case, Appellant does not adequately plead circumstantial evidence of an agreement. Conversations between the Appellees of Factory 2-U's creditworthiness do not alone raise an inference of an agreement. See Venture Tech., Inc. v. Nat'l Fuel Gas Co., 685 F.2d 41, 45 (2d Cir.), cert. denied, 459 U.S. 1007 (1982) ("[F]requent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement.").

While Appellant argues that the Appellees "acted in

29

concert by declining or limiting Factory 2-U's credit at approximately the same time" (Compl. ¶ 44), the Complaint fails to even allege this parallel conduct. Appellant contends that as of March 13, 2002, HSBC was declining orders, while Rosenthal had approved Factory 2-U orders. On April 23, 2003, Wells Fargo was allegedly declining all orders, while GMAC and CIT were extending at least some credit. Similarly, as of July 22, 2003, Capital was declining orders from Factory 2-U except for small orders that were accepted as accommodations for Capital's best clients, while on July 28, 2003, Sterling was willing to extend credit to Factory 2-U. And, as of September 15, 2003, GMAC was potentially increasing its credit limit to Factory 2-U, while Rosenthal was still not approving orders.

These allegations fall far short of demonstrating parallel behavior by Appellees because the Factors were choosing to decline, decrease, and even increase credit to Factory 2-U at different time periods. See Santiago, 629 F.3d at 133 ("While it is possible that there was such a plan . . . 'possibility' is no longer the touchstone for pleading sufficiently after Twombly and Iqbal. Plausibility is what matters." (citation omitted)).

Further, Appellant does not sufficiently plead any "plus factors" to suggest that the Appellees had entered into an agreement. The first plus factor, whether the Factors had a motive to enter into a conspiracy, is not alleged here. The Complaint includes a statement that through the alleged illegal activity, the Factors sought to "(1) minimize their risks and costs of doing business with garment manufacturers and their customers; (2) maintain and stabilize pricing structures for factoring services; and (3) stabilize their respective market shares." (Compl. ¶ 33.)

30

The foregoing allegations of Appellees' motivation of market behavior are precisely the legally insufficient facts we have cautioned against using as circumstantial evidence of an agreement. See Ins. Brokerage, 618 F.3d at 322. "In a free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits" and without a "scintilla of evidence of concerted, collusive conduct," this motive does not on its own constitute evidence of a "plus factor." Baby Food, 166 F.3d at 137.

Thus, beyond the legally insufficient allegations, Appellant points to no self-interested motivation of the Appellees to fix credit terms regarding Factory 2-U. To the contrary, the removal of a garment retailer from the industry would reduce the demand for a factors' services. See Ins. Brokerage, 618 F.3d at 322 n.20 (citation omitted) ("[M]ost courts rely on the *absence* of motivation or offense to self-interest to preclude a conspiracy inference from ambiguous evidence or parallelism." (citation omitted)); Cf. Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp., 475 U.S. 574, 596-97 (1986) ("[I]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise an inference of conspiracy.").

Appellant does not present any allegations of the second plus factor, i.e., that Appellees acted contrary to their interests. Appellant's theory of conspiracy is based on the belief that it was in the Appellees' best interest to extend credit to Factory 2-U and by declining to do so, the Appellees were acting contrary to their interests. This hypothesis ignores the routine conduct of Factors to determine the risk of a garment retailer prior to extending credit. In fact, the District Court considered a statement by Factory 2-U's chief

31

executive officer that the company had experienced a "sustained period of sub-par operating performance . . . [and] declining sales volume in both fiscal 2001 and 2002," the time period prior to the time the Factors began declining credit to Factory 2-U. (App. at 28-29 n.11); Twombly, 550 U.S. at 568 n.13 ("[T]he District Court was entitled to take notice of the full contents of the published articles referenced in the complaint.").

The Complaint presents no allegations that the Appellees' decision to limit or refuse credit to Factory 2-U was against each company's interest rather than a natural response to Factory 2-U's declining financial situation. See Baby Food, 166 F.3d at 135 ("[E]vidence of action that is against self-interest . . . must go beyond mere interdependence."); Cf. Cosmetic Gallery v. Schoeneman Corp., 495 F.3d 46, 54-55 (3d Cir. 2007) (explaining that the plaintiff failed to demonstrate how the defendant's decision not to sell to the plaintiff was against the company's economic interest).

The final plus factor—evidence implying a traditional conspiracy—is not alleged in the Complaint. The Complaint includes allegations that the Appellees shared what their individual companies were planning on doing with Factory 2-U's credit limit, but does not allege "assurances of common action" between the Defendants. See Ins. Brokerage, 618 F.3d at 322.

In light of Appellant's failure to allege the first element of a Section 1 claim—an agreement to apply similar credit terms—we do not need to consider whether Appellant

satisfied the remaining elements.[6]  We hold that the Complaint does not plausibly state a claim for a violation of Section 1 of the Sherman Act because Appellant failed to allege direct or circumstantial evidence of an agreement between the Appellees.

## 2. Denial Of Leave To Amend

A district court may enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint. Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 253 (3d Cir. 2007).  After judgment dismissing the complaint is entered, "a party may seek to amend the complaint (and thereby disturb the judgment) only through Federal Rules of Civil Procedure 59(e) and 60(b)." Id. at 252. After a final judgment is entered, Rules 59(e) and 60(b) provide a window to seek to reopen the judgment and amend the complaint. Id. at 253.[7]  Federal Rule of Civil Procedure

---

[6] Appellees argued to the District Court and again on appeal that Appellant's antitrust claim is barred by the statute of limitations.  The District Court did not reach this issue. Because Appellant failed to plead a Section 1 claim sufficient to overcome a motion to dismiss, we need not reach the issue of whether the statute of limitations bars such a claim. In re Exxon Mobil Corp. Sec. Litig., 500 F.3d 189, 202 n.16 (3d Cir. 2007) (declining to address whether plaintiffs' claims were barred by the applicable statute of limitations given the court's affirmance of dismissal of the claims).

[7] Rule 60(b) motions must be filed within one year after the entry of judgment.  FED. R. CIV. PROC. 60(c).  A Rule 60(b) motion is inapplicable in this case because Appellants'

59(e) states that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." FED. R. CIV. PROC. 59(e).[8]

Generally, motions for reconsideration under Rule 59(e) must rely on one of the following three grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest justice." Lazardis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010) (citation omitted). The factors that guide our review in a Rule 59(e) motion may be affected by the underlying judgment. See Adams v. Gould, 739 F.2d 858, 864 (3d Cir. 1984). In this Circuit, "'where a timely motion to amend judgment is filed under Rule 59(e), the Rule 15 and 59 inquiries turn on the same factors.'" Adams Golf, 381 F.3d at 280 (quoting Cureton v. NCAA, 252 F.3d 267, 272 (3d Cir. 2001)); see also Gould, 739 F.2d at 864. The Rule 15(a) factors include "undue delay, bad faith, prejudice, or futility." Adams Golf, 381 F.3d at 280 (citation omitted).

In Ahmed v. Dragovich, 297 F.3d 201 (3d Cir. 2002), we noted that "the liberality of [Rule 15(a)] is no longer applicable once judgment has been entered" because Rule 15(a) and 59(e) should not be employed in a manner contrary

Motion to Alter or Amend Judgment was filed within 28 days after the entry of judgment and is governed by Rule 59(e).
[8] Rule 59(e) motions require that a final judgment be issued. The District Court ordered that the "Complaint in the above-captioned action is DISMISSED." (App. at 47.) Where an order "d[oes] not specify that the dismissal was without prejudice, under Fed. R. Civ. P. 41(b), the dismissal 'operates as an adjudication upon the merits.'" Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000).

to "favoring finality of judgments and the expeditious termination of litigation . . . . that would render those provisions meaningless." Id. at 208 (citation and internal quotation marks omitted). The District Court interpreted this language to reflect a conflict in our jurisprudence when confronted with a Rule 59(e) and Rule 15(a) motion and applied the general Rule 59(e) requirements: that the plaintiff must present an intervening change in law or new evidence.[9] Yet, Ahmed is not inconsistent with this Court's other precedent requiring that we consider Rule 15(a) and Rule 59(e) motions together and apply the analysis typical to Rule 15(a). Ahmed considered the Rule 60(b) motion and the Rule 15(a) motion together on the grounds that it "would be a needless formality for the court to grant the motion to reopen the judgment only to deny the motion for leave to amend" and denied both motions because the amended pleading was futile. 297 F.3d at 209.

Here, the District Court resolved the Rule 59(e) and Rule 15(a) motions by concluding that Appellant had not introduced an intervening change in law or new evidence. Procedurally, we believe that the appropriate manner to dispose of this issue is to consider the motions together and determine what outcome is permitted by consideration of the Rule 15(a) factors. In our view, the end result remains the

---

[9] The District Court also relied on the not precedential opinion, Walsh v. Quinn, 327 F. App'x 353 (3d Cir. 2009), to conclude that an intervening change in law, new evidence, or manifest injustice was required to grant the Rule 59(e) motion. Under Third Circuit internal operating procedure Rule 5.7, not precedential opinions are not binding on this Court.

same. The Proposed Amended Complaint is futile and the Rule 59(e) and Rule 15(a) motions were properly denied.

Futility is a basis on which to deny a Rule 59(e) motion accompanied by a Rule 15(a) motion. See Gould, 739 F.2d at 864. Futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Great Western, 615 F.3d at 175 (citation and internal quotation marks omitted). Futility of an amended complaint is reviewed under the "same standard of legal sufficiency as applies under [F.R.C.P.] 12(b)(6)." Ahmed, 297 F.3d at 209 (citations and internal quotation marks omitted).

To determine whether the PAC is futile, we question whether the additional allegations are sufficient to state a claim under Section 1 of the Sherman Act. The PAC includes an additional claim in Count I, namely, a rule of reason claim based on illegal information sharing. It also contains allegations of 37 additional telephone conversations between the original Defendants. The amended pleadings do not amount to direct or circumstantial evidence of an agreement to fix credit terms regarding Factory 2-U. Nowhere in the PAC does Appellant allege any specific agreement to conspire regarding credit terms. See Twombly, 550 U.S. at 565 n.10 (explaining that the plaintiff's failure to allege a "specific time, place, or person involved in the alleged conspiracies" left "no clue as to which of the [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place").

Factual allegations in Count I of the PAC add nothing to the Plaintiff's attempt in the original Complaint at alleging a claimed agreement. Count I of the PAC asserts an

agreement to illegally share information. The essence of this new claim remains the same as what the Plaintiff asserted in the rule of reason claim in the original Complaint in Count III, which is repeated verbatim in Count IV of the PAC.

As discussed at length in this opinion, we reject Appellant's contention that the telephone conversations between the Appellees with respect to Factory 2-U's creditworthiness are enough to constitute direct evidence of a violation of the Sherman Act. Without evidence of an agreement, the mere exchange of credit information is not enough to withstand a motion to dismiss for a Section 1 claim. See Cement Mftrs., 268 U.S. at 599-600; Zoslaw, 693 F.2d at 885-86; Michelman, 534 F.2d at 1048.[10]

The PAC's allegations are deficient regarding circumstantial evidence of an agreement necessary to overcome a motion to dismiss. At the outset, the PAC includes allegations of Factors' differing approaches to dealing with Factory 2-U. Appellant contends that as of March 13, 2003, HSBC was declining orders, while Rosenthal had approved Factory 2-U orders. On March 28, 2003, CIT had opened up a $3 million partially secured credit line. The PAC itself describes a secured credit line as a "'special arrangement' above and beyond ordinary credit term." (App. at 246.) On April 23, 2003, Wells Fargo was

---

[10] Judge Roth agrees with the conclusion here that the mere exchange of credit information is not enough to withstand a motion to dismiss. Nevertheless, when the commodity being exchanged is credit itself, Judge Roth believes that particular attention should be paid to the allegations of exchange of credit information.

allegedly declining all orders, while GMAC and CIT were extending at least some credit.

The PAC also alleges conduct by the Appellees in July or August of 2003. HSBC had stopped checking Factory 2-U's credit as far back as October 2002 and would continue to decline Factory 2-U's account. Milberg was approving up to $750,000 on some terms and in another phone call stated it was approving up to $500,000. Rosenthal was holding $2 million in orders and HSBC was not approving orders. Wells Fargo credit limit was $466,000 and it was declining $360,000 in orders. GMAC was declining $1 million in future orders. Capital had Factory 2-U on an order to order basis.

Similarly, as of July 22, 2003, Capital was declining orders from Factory 2-U except for small orders that were accepted as accommodations for Capital's best clients; meanwhile, on July 28, 2003, Sterling was willing to extend credit to Factory 2-U. And, as of September 15 and 16, 2003, GMAC was potentially increasing its credit limit to Factory 2-U and Milberg planned to recommend $500,000 to $600,000, while Rosenthal was still not approving orders and Wells Fargo was declining orders. In October 2003, Rosenthal and HSBC were declining all Factory 2-U orders, HSBC was declining all Factory 2-U orders, Milberg was still offering a $500,000 credit line, and Capital was approving Factory 2-U's account up to $300,000.

The PAC's attempts to allege parallel conduct are minimal. On July 28, 2003, Sterling wanted to reduce Factory 2-U's high credit line from $750,000 to $250,000 and on the following day, Milberg would reduce its credit line from $750,000 to $250,000. Furthermore, the PAC highlights

a progression of the Appellees' credit lines to Factory 2-U from January 2002, before the Appellees' alleged collusion, to July 2003, where the Appellees were either pulling, reducing, or maintaining its credit line to Factory 2-U.

Even if we assume that Appellant cured the complaint by alleging parallel conduct, parallel conduct alone is not enough to satisfy the requirements of an agreement. As in the original Complaint, Burtch does not include any allegations of plus factors—Defendants' motive, or that Defendants acted contrary to their interests, or evidence implying a traditional conspiracy. Nor does the PAC allege that Defendants' actions were anything more than "routine market conduct" based on Factory 2-U's financial condition. Twombly, 550 U.S. at 566. In fact, in one instance, the PAC indicates the contrary, that GMAC would potentially increase Factory 2-U's credit limit "depending on Factory 2-U's financial plan." (App. at 252.)

The exchange of credit information without any direct or circumstantial evidence of an agreement does not plausibly state a Section 1 claim under the Sherman Act. We hold that the futility of the Proposed Amended Complaint is reason to deny both the Rule 59(e) motion and the 15(a) motion and that the District Court did not abuse its discretion in doing so. See Ahmed, 297 F.3d at 209 (explaining that the failure to "cure the defects in the original pleading . . . may be a valid reason both for denying a motion to amend under Rule 15(a) and for refusing to reopen the judgment under Rule 60(b)."); see also Adams Golf, 381 F.3d at 280 (holding that the district court did not abuse its discretion in denying leave to amend because the "new allegations consist . . . [of] facts not necessarily curative of the pleading problems at issue." (citation and internal quotation marks omitted)).

## IV. **CONCLUSION**

For the reasons discussed above, we will affirm the judgment of the District Court.